**Louis J. SCALES, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 95–CF–214.**

District of Columbia Court of Appeals.

Argued Oct. 3, 1996.
Decided Dec. 23, 1996.

---

Jaclyn S. Frankfurt, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.

Ann K.H. Simon, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, John R. Fisher and Roy W. McLeese, III, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, KING and REID, Associate Judges.

KING, Associate Judge:

Louis J. Scales appeals his convictions for armed second degree murder and related weapons charges, contending the trial court committed reversible error in certain rulings involving the only eyewitness to testify at trial, Kenneth Hodge. Specifically, Scales contends that the trial court erred by: (1) admitting into evidence grand jury testimony given by Hodge about his prior identification of the appellant, where the witness had first testified at trial concerning the identification but later in part recanted that testimony; (2) not giving, *sua sponte,* a limiting instruction immediately after the court allowed the government, on redirect examination, to impeach its own witness (Hodge) with portions of the witness's grand jury testimony; (3) refusing to allow the defense to recross-examine Hodge after he recanted his earlier testimony and was impeached with his grand jury testimony; and (4) denying appellant's request to call Hodge as a defense witness at a pretrial hearing on a motion to suppress identification. Finding no error requiring reversal, we affirm.

## I.

Appellant Louis J. Scales was tried before a jury on charges of armed first degree murder, possession of a firearm during a crime of violence, and carrying a pistol without a license,[1] in connection with the August 30, 1993, shooting death of Torey Lawrence. Scales was convicted of armed second degree murder and the weapons charges. A co-defendant, Russell Ross, was acquitted on related charges. The government principally relied upon the testimony of Kenneth Hodge, who was an eyewitness to the shooting which caused Lawrence's death. In addition to Hodge's testimony, the government presented the testimony of investigating police officers concerning Hodge's identification of Scales as the shooter, testimony by other police officers who arrived at the scene of the shooting that the victim said, before he died, that "Reds" shot him, evidence that Scales's nickname was "Reds," and evidence that four months after Lawrence was killed Scales possessed a gun similar to the gun used to kill Lawrence.

Hodge testified at trial on direct examination that he was present when, earlier on the day of the shooting, Scales's co-defendant Ross got into a dispute with Lawrence. Hodge identified Scales in court as the "light-skinned one" who accompanied Ross. Then Hodge described in detail the events occurring later that same day when he saw Scales and Ross return, saw Scales approach Lawrence, and saw Scales shoot Lawrence at close range with a gun he described as looking like a black "Mack." Hodge also testified

---

1. D.C.Code § 22–2401 (1989 Repl.), § 22–3202 (1995 Supp.); D.C.Code § 22–3204 (1995 Supp.); D.C.Code § 22–3204 (1995 Supp.).

that after the shooting he left the scene, returning ten to fifteen minutes later while Lawrence was still lying on the ground. Hodge said nothing about the shooting to police until some months later.

Hodge also testified that he selected photographs of Scales and Ross from photo arrays at the United States Attorney's office on March 24, 1994, and told detectives what he saw on the day of the shooting. In response to questions from government counsel at trial, Hodge testified that he told the truth at the U.S. Attorney's office, and that no one suggested to him the identity of the shooter or mentioned any names to him. Hodge also testified that he was interviewed by defense counsel, but he had not told her the truth about the shooting.

On the same day he made the out-of-court photo array identification of Scales, Hodge testified before a grand jury about the shooting of Lawrence and about the identification procedures. At trial, Hodge's direct testimony was consistent with his grand jury testimony. However, his answers on cross-examination were at times inconsistent with his direct testimony, and he indicated he might have been pressured to identify Scales. On redirect, Hodge recanted his identification of Scales, testifying that he lied to the grand jury, that he lied during direct examination, and that he did not see who shot Lawrence. Hodge stated that he changed his testimony because the prosecutor and the detectives had pressured him to give his original testimony.

At this point, government counsel requested and received permission from the court to impeach its own witness with his grand jury testimony. The government read into the record, and questioned Hodge about, two separate segments of his grand jury testimony, consisting of: (1) testimony about an argument between Lawrence and Ross that occurred earlier on the day of the shooting, Hodge's description of the events of the shooting, the gun used by the shooter, and his statement that he did not know the shooter; and (2) Hodge describing his prior identification of "Reds" from the photo array. Defense counsel objected to use of the grand

jury testimony on the ground that the government could not claim genuine surprise. The defense did not request an immediate limiting instruction and the court did not give one.

After redirect, the defense asked to re-cross-examine Hodge but the court denied the request. Hodge was then excused and the court took a brief recess, followed by approximately an hour of testimony from two witnesses and a one hour lunch break. After the lunch break, defense counsel moved for mistrial, citing *In re L.D.O.*, 400 A.2d 1055 (D.C.1979), and contending that the trial court erred in admitting a witness's prior identification when the witness was uncertain of the identification at trial. That motion was denied. The jury later convicted Scales of second degree murder and the weapons charges, and this appeal followed.

## II. Admissibility of the Out-of-Court Identification

Although the murder of Torey Lawrence occurred in August of 1993, Hodge did not emerge as a witness until months later. On March 24, 1994, upon being shown a photo array by one of the investigating officers, Hodge selected a photograph of Scales, whom he called "Reds," as the person who shot Lawrence, although he did not know Scales's given name.[2] Later that same day Hodge testified before a grand jury about the murder of Lawrence.

At trial Detective Vacin testified about the photo identification procedures and testified that Hodge selected a photo of Scales as the shooter. On direct examination Hodge described and affirmed his prior identification of "Reds" in the photo array at the U.S. Attorney's office, stating that he did not know that person's given name. He also made an in-court identification of Scales as the person who shot Lawrence. On cross-examination, however, Hodge testified that: (1) he did not know the name or nickname of the shooter, but that he did know Scales and knew Scales's nickname was "Reds," (2) he was pressured or threatened by police to say that "Reds" was the shooter, and (3) in the

---

2. Hodge also selected a photograph of co-defendant Ross from a separate array.

evening after the shooting he spoke by telephone to Scales and told Scales about the shooting of Lawrence. In response to the government's questions on redirect, Hodge recanted his identification of Scales, testifying that he could not really say the shooter was Scales. Then he stated that he lied to the grand jury, and that he did not see who shot Lawrence.

Scales argues, in light of Hodge's equivocation on cross-examination and his recantation on redirect of his identification of Scales as the shooter, that it was error for the court to allow the government to introduce his prior identification of Scales for any purpose other than impeachment, and that the court erred by not immediately instructing the jury that Hodge's grand jury testimony, which included the prior identification statement, could be considered only with respect to Hodge's credibility. We reject the first contention for the reasons discussed below and deal with the second in Part III.

■ Scales contends that Hodge's prior identification of Scales was inadmissible as substantive evidence because Hodge destroyed the predicate for its admissibility when he testified on redirect that he lied before the grand jury and that he did not see who shot Lawrence. As Scales correctly observes, we have held that evidence of a prior identification is not properly admissible when the declarant is uncertain of, or recants, the prior identification at trial. *See Fletcher v. United States,* 524 A.2d 40, 43 (D.C.1987) (witness's repudiation at trial of his prior identification of the defendant rendered the earlier statement inadmissible hearsay); *In re L.D.O., supra,* 400 A.2d at 1057 (prior identification by witness is rendered unreliable when the witness testifies to significant doubt about the identification);[3] *cf. Riley v. United States,* 647 A.2d 1165, 1171 n. 13 (D.C.1994) (prior identification exception applies when witness does not repudiate his prior out-of-court identification and is available for cross-examination on the point). However, none of these cases addressed the

unusual circumstances presented in this case. In each of our previous cases where we held that it was error to allow testimony concerning the earlier identification, the witness expressed significant doubts about his prior identification, but did not in any way identify the defendant as the perpetrator of the offense. Here, Hodge made an in-court identification of Scales as the shooter, and he both affirmed his prior identification during direct examination and repudiated it during redirect examination.

We are persuaded that Hodge's identification of Scales in direct examination provided the necessary predicate for admission of Hodge's pretrial identification statement, and that this predicate was not fatally undermined by Hodge's later recantation during redirect. We were faced with a similar question in *Payne v. United States,* 516 A.2d 484 (D.C.1986), where the witness identified the appellants as the robbers on direct examination, but on cross-examination recanted his testimony. On redirect, the government attempted to rehabilitate the witness's testimony given on direct but was not successful. Payne argued that the eyewitness's direct testimony implicating him must be disregarded in its entirety because the witness later recanted. *Id.* at 492–93. We disagreed:

> Contrary to appellants' assertions, [the witness'] recantation on cross-examination did not make his testimony, directly implicating appellants ... incredible as a matter of law. Rather ... conflicts created by a witness' recantation, like other internal inconsistencies within a witness' testimony, are factual questions for the jury to resolve.... [W]here a witness recants, the trier of fact must decide whether to accept as true the witness' original testimony or revised testimony.

*Id.* at 493. While we recognize that the admissibility of out-of-court identification statements was not at issue in *Payne,* we think *Payne*'s reasoning applies with equal force to a trial court's determination of

---

3. The government contends that *In re L.D.O.* and *Fletcher* are no longer good law either because of later Supreme Court precedent, *see United States v. Owens,* 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988), or because of an amendment to D.C.Code § 14–102 (1996 Supp.), which became effective after Scales's trial. See note 5, *infra.* In light of our resolution of this issue on other grounds, we do not consider either contention.

whether the necessary predicate has been established to allow a witness's prior identification statement, when the witness at trial both affirms and then recants the identification.

■ For this reason we conclude that the trial court may accept as credible, for purposes of determining whether the prior identification exception to the hearsay rule applies, the witness's original testimony. We believe the defendant in these situations is adequately protected from the dangers of hearsay evidence by his opportunity to cross-examine the witness about his change in testimony. *See Gilbert v. California,* 388 U.S. 263, 272, 87 S.Ct. 1951, 1956–57, 18 L.Ed.2d 1178 (1967); *In re L.D.O., supra,* 400 A.2d at 1057; *Morris v. United States,* 398 A.2d 333, 338 (D.C.1978); *Clemons v. United States,* 133 U.S.App. D.C. 27, 39–40, 408 F.2d 1230, 1242–43 (1968) (en banc). In fact, it was precisely the appellant's opportunity to cross-examine Hodge that eventually resulted in Hodge's recantation on redirect. In addition, although not a requirement for its admissibility, there was corroboration of Hodge's testimony identifying Scales. Detective Vacin testified that Hodge had identified Scales from the photo array, and Hodge never directly recanted his testimony on direct examination that he selected the shooter in the photo array. We held in *Murphy v. United States,* 670 A.2d 1361, 1366 (D.C. 1996), that such evidence is sufficient to constitute corroboration of an extra-judicial identification. Therefore Detective Vacin's testimony can be taken into account on the question of whether the prior identification evidence was admissible. Accordingly, we hold that the trial court did not err in admitting evidence of Hodge's prior identification of Scales because the predicates for admissibility were sufficiently established when Hodge's trial testimony was subject to cross-examination and both Hodge and Detective Vacin affirmed the identification at trial.

## III. Failure to Give Limiting Instruction

Scales contends that he is entitled to reversal because the trial court did not give an immediate limiting instruction after the prosecution, upon a claim of surprise, "impeached" his principal witness with the witness's grand jury testimony. No limiting instruction was requested by the defense [4] and, for that reason, the government argues the plain error standard should apply, which would require the defense to show, among other things, that the error "compromised the fairness or integrity of the entire trial or threatened … a clear miscarriage of justice…." *See United States v. Olano,* 507 U.S. 725, 734–35, 113 S.Ct. 1770, 1777–78, 123 L.Ed.2d 508 (1993); *Hunter v. United States,* 606 A.2d 139, 146 (D.C.1992); *Beale v. United States,* 465 A.2d 796, 802 (D.C.1983), *abrogated on other grounds by Winfield v. United States,* 676 A.2d 1, 4 (D.C.1996) (en banc). Scales maintains, however, that the lesser standard of *Kotteakos v. United States,* 328 U.S. 750, 756–57, 66 S.Ct. 1239, 1243–44, 90 L.Ed. 1557 (1946), applies, which requires reversal unless it can be said, with fair assurance, that the jury verdict was not substantially swayed by the error. *Lucas v. United States,* 436 A.2d 1282, 1285 (D.C.1981). We need not decide which standard to apply here because, for the reasons stated below, we are satisfied that reversal is not warranted under the less demanding of the two.

The questioning by the prosecutor which introduced so-called "impeaching" evidence occurred under the following circumstances. In August 1993, on a public street in broad daylight, Lawrence was mortally wounded by a man he identified as "Reds" before he died. "Reds" is the nickname of appellant Scales, and the deceased's identification of Reds as his assailant was admitted by the trial judge as a dying declaration, a ruling not challenged here. The government's theory was that Scales shot Lawrence because Lawrence had instigated an altercation with Russell Ross, an associate of Scales, earlier the same day. Scales and Ross left the scene after this incident, but returned later with Scales armed with a semi-automatic pistol which he used to kill Lawrence.

---

4. The trial court gave the standard limiting instruction for prior inconsistent statements as part of its final instructions.

Kenneth Hodge, the witness who was the subject of the "impeachment" in question, was present at both the first encounter between Lawrence and Ross, and the shooting that occurred later. He did not inform the police, however, until nearly seven months later, when, according to the testimony of a police officer, Hodge identified Scales from a photo array, the identification procedure discussed in Part II. above. According to the officer, when Hodge selected Scales's photo, he stated, "[T]hat is the shooter right there. That's Reds." Hodge later appeared before the grand jury where he testified that he had selected the photo of the shooter from the photo array. He repeated that testimony at trial, on direct examination, and he also made an in-court identification of Scales as the man who shot and killed Lawrence. During direct examination, Hodge described the initial encounter between Lawrence and Ross. Hodge testified that Ross then left the scene in a blue automobile with a light-skinned man driving. Later the same car returned to the area and parked. This time Ross drove and the light-skinned man, who was the passenger, exited the vehicle, approached Lawrence and engaged him in a conversation. The light-skinned man then produced a black "Mack" semi-automatic pistol and began firing. Hodge then departed, returning after the police arrived to observe Lawrence on the sidewalk with numerous gunshot wounds. As we have said, he did not speak to the police about the incident until months later.

During cross-examination, Scales's attorney questioned Hodge in a manner suggesting that Hodge was involved with others in the neighborhood where the shooting took place, in a scheme to rob prospective drug buyers. Hodge also testified that a brown station wagon containing four men entered the block just before the shooting. He responded "no," however, to a leading question asking whether he knew if Lawrence had approached the men in the station wagon with a gun in his hand intending to rob them. He also answered "no" to another leading question asking whether one of the men in the station wagon shot Lawrence. He also testified that the police had pressured him to identify Scales when he viewed the array.

On redirect, the prosecutor questioned Hodge regarding his statement that he had been pressured by the police to identify Scales. Hodge repeated the claim implicating not only the police but the prosecutor as well. Moreover, when Hodge was asked whether his previous testimony, on direct and at the grand jury, that Scales was the shooter was true, he responded: "Nah." The prosecutor then claimed surprise and sought to impeach Hodge with his grand jury testimony pursuant to D.C.Code § 14–102.[5] Scales objected solely on the ground that there was no genuine surprise.[6] The trial court overruled the objection, and no further relevant objections were made by the defense during the course of the redirect examination.[7] The prosecutor then read portions of the grand jury testimony into the record.

In the first part of the testimony so read ("the recitation of events segment") Hodge, in summary, said that early on the day in question, he saw a man, whom he did not know (later identified as Ross), sitting in a blue and gray station wagon when Lawrence approached and grabbed him. The car had been driven to the area by a light-skinned man who was away from the vehicle when the disagreement he described took place. The light-skinned man returned to the vehicle and drove the station wagon away, with the other man as his passenger. Later the same station wagon returned with the same

5. This statute, when this case was tried, permitted impeachment of a party's own witness upon a claim of surprise with the impeaching material admitted for that purpose only, not as substantive evidence. *See Lofty v. United States*, 277 A.2d 99, 101 (D.C.1971). The statute has since been amended to provide that some impeaching material given under oath can be admitted as substantive evidence. The government argues that the amended statute would have permitted the grand jury testimony used here to be so considered; therefore, no limiting instruction would be necessary. The government urges that we decide this issue on that ground. We decline to do so because we affirm for another reason.

6. Scales has not renewed any objection on that ground in this appeal.

7. Counsel objected at only one other point, suggesting that the witness might need his own attorney. That objection was overruled.

two men inside; however, on this occasion, the light-skinned man was the passenger and the other man the driver. The light-skinned man got out of the car armed with a black "Mack" and shot Lawrence a number of times. At no time was the identity of the shooter or the other man mentioned. At trial Hodge was asked whether he had given this testimony before the grand jury and he affirmed that he had, although he said he testified under pressure.

Next the prosecutor turned to the questions Hodge was asked at the grand jury regarding the photo-identification session that had taken place earlier in the day that Hodge testified before the grand jury ("photo-identification segment"). In that testimony Hodge stated he had been shown a group of photographs by a police detective and that he had selected a photo of the light-skinned man, *i.e.,* the man who shot Lawrence. Hodge also testified concerning a second photo array from which he selected a photo of the man who had driven the station wagon into the area the second time. Again, no names were mentioned. No other portions of the grand jury testimony were elicited.

The grand jury testimony, thus presented, can be described as falling into two separate and distinct parts. The recitation of events segment repeats the testimony previously given on direct examination by the witness that one of the two men, not identified by name, had a disagreement with the deceased, that he and the light-skinned man left the area in a blue and gray station wagon, that they returned later in the same vehicle, and that the light-skinned man produced a gun and shot the decedent. This segment of the grand jury testimony was consistent with most of the trial testimony previously given. It was also inconsistent, in one significant way, as discussed below, with the witness's trial testimony.

■ In the photo-identification segment, the witness related that he had selected a photo of the light-skinned man, the one who had shot the decedent, from a photo array. Dealing with this testimony first, the government argues that the testimony is admissible,

as substantive evidence, because it relates to the witness's identification of the assailant. We agree. In *Warren v. United States,* 436 A.2d 821 (D.C.1981), we considered the admissibility at trial of a witness's testimony given at a pretrial suppression hearing. We held that it was error to admit portions of that testimony, over objection, because the testimony constituted prior consistent testimony. We also held, however, that those portions of the "testimony consisting solely of descriptions or identifications of the complaining witness' assailants are admissible as substantive evidence under the hearsay exception for prior description testimony...." *Id.* at 837. Similarly, in this case the grand jury testimony relating to the procedure involving Hodge selecting a photo from an array is also admissible as substantive evidence for the same reason. Therefore, for the photo-identification segment of the grand jury testimony, because the testimony could be considered for its truth, no limiting instruction was called for.

■ As we have said, however, the remaining testimony could not be characterized as identification evidence, admissible as substantive evidence on that ground. The recitation of facts segment was essentially repetitive of Hodge's testimony on direct examination. The bulk of this testimony was not damaging to the defense because it did not directly inculpate the appellant; it simply repeated Hodge's story that he had witnessed an altercation, that the two men left, but later returned, and one of them, armed with a gun, shot the victim. This testimony can more properly be characterized as a prior consistent statement, but there was no objection to the testimony on that ground.[8] Hearsay that comes in without objection to the testimony on that ground can be considered by the trier of facts and "given its full probative value." *See Hicks–Bey v. United States,* 649 A.2d 569, 576 (D.C.1994), *cert. denied,* — U.S. ——, 116 S.Ct. 251, 133 L.Ed.2d 176 (1995). Moreover, because Scales was not directly implicated by this testimony, it was not harmful to his cause.

---

8. As noted above, the only relevant objection made was on the ground that there was no

genuine surprise, a contention not made in this appeal.

It follows, therefore, that the failure to give a limiting instruction, even assuming one was required for unobjected-to hearsay, was also harmless. *See Jordan v. United States,* 633 A.2d 373, 377 (D.C.1993).

■ The only potentially damaging portion of this testimony relates to the witness's vacillation at trial on the question of whether he saw the shooter. First, on direct examination, he stated that he did indeed see who had shot the decedent; later, on redirect, he said he did not. In the grand jury testimony the witness said he did see the shooter. Therefore, the grand jury testimony contradicted his testimony on redirect. The question, of course, is not whether the jury could properly hear this prior inconsistent statement. It could. *See Stewart v. United States,* 490 A.2d 619, 625 (D.C.1985) (prior inconsistent statement admissible only for impeachment and not as truth of the matters contained therein). This testimony, under these circumstances, however, was admitted only for a limited purpose and the only issue is whether the trial court's failure to give an immediate limiting instruction *sua sponte* constitutes reversible error. We conclude that, on these facts, it does not.

We begin our analysis by emphasizing that no such instruction was requested. In a line of cases beginning with *Johnson v. United States,* 387 A.2d 1084 (D.C.1978) (en banc), we have receded from a rule of near automatic reversal[9] in cases where no limiting instruction was given after the government impeached its own witness.[10] We have concluded that automatic reversal, where counsel did not request the immediate limiting instruction, would "destroy the incentive of defense counsel to point out errors during the trial...." *Id.* at 1087. Counsel's silence, in the face of trial court conduct later asserted to be error, is significant for two reasons. First, it denies the trial court the opportunity to correct the error. *Id.* at 1086. Second, a failure to object, particularly where trial counsel was, as here, an experienced litigator, provides an informed and contemporaneous assessment of whether there was any damage due to the trial court's actions. *See Hunter v. United States,* 606 A.2d 139, 145 (D.C.1992) (*sua sponte* intervention by judge not necessary when judge could reasonably conclude, in the absence of defense objection, that prosecutor's remarks were not prejudicial); *Parks v. United States,* 451 A.2d 591, 613 (D.C.1982) (failure of defense to object suggests defense did not perceive prejudice). In short, if able trial counsel, immersed in the flow of the trial, and familiar with its "heart and soul," was not concerned that this aspect of the grand jury testimony might be improperly weighed by the jury, we are hard pressed from this distant vantage point to conclude otherwise. *Cf. In re S.G.,* 581 A.2d 771, 774–75 (D.C.1990).[11]

Moreover, the circumstances here are quite different from the typical case where the government is surprised by the testimony of one of its witnesses. Ordinarily when surprise is declared, the out-of-court statement is not only damaging, but the statement constitutes the only evidence presented by that witness linking the defendant to the offense. *See Lofty, supra,* 277 A.2d at 100.[12]

---

9. *See, e.g., United States v. McClain,* 142 U.S.App. D.C. 213, 218, 440 F.2d 241, 246 (1971) ("whenever evidence is admitted only for a limited purpose, it is plain error, in the absence of manifest waiver, to omit an immediate cautioning instruction"); *see also Coleman v. United States,* 125 U.S.App. D.C. 246, 248–49, 371 F.2d 343, 345–46 (1966).

10. *See Byers v. United States,* 649 A.2d 279, 285 (D.C.1994) ("Although a cautionary instruction 'is required when a party, surprised by its own witness, impeaches the witness with a prior inconsistent statement,' the failure to give it does not automatically result in reversal." (quoting *Johnson, supra,* 387 A.2d at 1087 n. 5)); *Stewart, supra,* 490 A.2d at 625 (failure to give an immediate limiting instruction does not always constitute plain error); *Gordon v. United States,* 466 A.2d 1226 (D.C.1983) (reversal is not automatic when the trial court fails to give a *Lofty* instruction); *Lucas, supra,* 436 A.2d at 1283–85 (holding that the harmless error rule applies to review of a trial court's failure to give a *sua sponte* cautionary instruction).

11. Nor do we think that certain remarks by the prosecutor, in closing argument, can fairly be read as inviting the jury to give improper consideration to the "impeachment" evidence. *See Hawkins v. United States,* 606 A.2d 753, 761 (D.C.1992).

12. In *Lofty* the out-of-court statement was not just the only evidence, offered by the witness, linking the defendant to the crime, it was the

In those circumstances, to guard against the jury's considering the out-of-court statement as substantive evidence, the need for an immediate cautionary instruction is far more compelling. *See Johnson, supra*, 387 A.2d at 1087 n. 5. Such a consideration does not apply here. First, this jury heard testimony of the dying declaration of the deceased identifying "Reds" as his assailant, evidence that "Reds" was Scales's nickname, and the testimony linking Scales to a black Mack semiautomatic pistol. Moreover, on direct examination, Hodge testified, unequivocally, that he saw the shooter and he identified Scales in court as that person. Thus, there was substantive evidence before the jury from this very witness on the point at issue. The danger, discussed above, that the jury will give improper weight to the out-of-court testimony unless immediately instructed as to its proper use, is simply not present here as it was in *Lofty*. Therefore, although there is no question that Hodge's testimony, overall, was crucial, we cannot say, under the circumstances presented here, where the trial court failed to give a limiting instruction *sua sponte*, when such an instruction was given later in the general charge, that the jury verdict was substantially swayed by that failure. *See Lucas, supra*, 436 A.2d at 1285.[13]

## IV. The Defense Request to call Hodge as a Witness at the Pretrial Suppression Hearing

At the pretrial suppression hearing, Detective Vacin described the photo array procedure, and he testified that Hodge selected a photo of Scales from the array, identifying him as "Reds," the person who shot Lawrence. Defense counsel, seeking to establish that Hodge's out-of-court identification should be suppressed because the photo array was unduly suggestive and was obtained in a coercive environment, cross-examined

Detective Vacin in that light. Defense counsel then requested that Hodge be called to testify, proffering that his testimony would differ drastically from that of the detectives. The court denied the request, stating that Hodge had nothing to offer regarding suggestivity, and that the court would not make a final reliability ruling until the appropriate time at trial. The trial court found it had sufficient information to rule that the photo identification procedure was not defective or unduly suggestive, giving detailed facts and reasoning to support its finding.[14]

At a pretrial suppression hearing, the trial court enjoys broad discretion in whether to allow proffered evidence regarding suggestivity, and we will overturn an exercise of that discretion only upon a showing of abuse. *Towles v. United States*, 428 A.2d 836, 846 (D.C.1981); *see also Minor v. United States*, 647 A.2d 770, 775 (D.C.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 347, 133 L.Ed.2d 244 (1995). Furthermore, the rules of evidence normally applied in criminal trials do not apply with full force at suppression hearings. *Mitchell v. United States*, 368 A.2d 514, 518 (D.C.1977); *United States v. Matlock*, 415 U.S. 164, 172–73, 94 S.Ct. 988, 993–94, 39 L.Ed.2d 242 (1974). Scales contends that because he proffered that Hodge's testimony would differ from that of Detective Vacin and would be relevant to suggestivity and reliability, the trial court committed reversible error by not hearing from Hodge.

Scales's argument fails for several reasons. First, Scales's proffer was insufficient for review by this court: he gave no details of the alleged differences in testimony and did not preview the trial testimony fragments upon which he now relies. *See McBride v. United States*, 441 A.2d 644, 656 (D.C.1982) (when the court instructs witness not to answer, in order to show error the

---

only such evidence of any kind from any source. *Id.* at 100.

13. We also reject appellant's claim that the trial court erred in not permitting recross-examination. Whether to allow recross-examination is a matter committed to the sound discretion of the trial court. Here, we discern neither an abuse of discretion nor the introduction of new matters in redirect that would invoke the confrontation

clause of the Sixth Amendment. *Singletary v. United States*, 383 A.2d 1064, 1073 (D.C.1978).

14. The trial court stated that everyone in the photo array looked as young as appellant and had similar complexions and hair styles, and that there was nothing inherently suggestive about the fact that both defendants' photos were placed fifth in stacks of nine photos.

proponent of the testimony must proffer the testimony expected, or something which clearly indicates it); *District of Columbia v. Barriteau*, 399 A.2d 563, 569 (D.C.1979) ("[t]o properly preserve excluded testimony for review on appeal, trial counsel must normally make an offer of proof ... [sufficient] 'to lay the foundation for an affirmative showing of error'") (quoting *Shlopak v. Davison*, 34 A.2d 126, 127 (D.C.1943)). Second, even though Hodge testified on cross-examination and redirect at trial that he was pressured to make the identification, Scales did not seek reconsideration of the pretrial ruling on admissibility. To be sure, in most circumstances the pretrial ruling is the law of the case and cannot ordinarily be revisited at trial; however, when new grounds, including new facts, surface at trial, the defendant may seek to reopen the matter. *Rushing v. United States*, 381 A.2d 252, 257 (D.C.1977). Scales failed to do so, and he also failed to request that the court make a final reliability determination.[15] Because he did not attempt to reopen the matter, when events at trial suggested that he might have been entitled to do so, the issue has not been preserved. *Smith v. United States*, 666 A.2d 1216, 1225 (D.C.1995); *James v. United States*, 580 A.2d 636, 642–43 (D.C.1990).

 Finally, even if Scales's proffer was sufficient and the issue was preserved, we conclude that the trial court did not commit reversible error in disallowing Scales's request to call Hodge as a witness at the pretrial hearing. In *Minor, supra*, 647 A.2d at 775, the trial court denied a defense request to call the identifying witness at a hearing on a motion to suppress the show-up identification. The government had presented only the testimony of another officer who had witnessed the show-up identification.

The trial court ruled, on the basis of that testimony, that the identification procedure was not suggestive and the identification was reliable. We held that the trial court did not abuse its discretion in denying the request to call the witness because the contested witness's trial testimony was fully consistent with the other officer's suppression hearing testimony, and because testimony from the contested witness would not have affected the outcome of the motion. *Id.* Similarly, Hodge's testimony on direct examination was fully consistent with Detective Vacin's suppression hearing testimony. In addition, as we discussed in Part II., Hodge's direct testimony established the necessary predicate for admitting Hodge's prior identification of Scales. Therefore, in the absence of a specific proffer by counsel that Hodge would deny the identification, we have no basis for concluding that Hodge's testimony at the suppression hearing would have affected the outcome of the motion. Under these circumstances, we cannot say that the trial court abused its discretion in refusing to hear testimony from Hodge at the suppression hearing.

## V.

Because we conclude that there were no errors committed by the trial court requiring reversal, the judgment of conviction is

*Affirmed.*

---

15. Scales also contends that remand is required because the trial court never made a final reliability determination. We disagree. No reliability determination is required unless the trial court has determined that the eyewitness identification was unduly suggestive. *Greenwood v. United States*, 659 A.2d 825, 827–28 (D.C.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 326, 133 L.Ed.2d 227 (1995); *see also Neil v. Biggers*, 409 U.S. 188, 196, 198–200, 93 S.Ct. 375, 380–381, 381–383, 34 L.Ed.2d 401 (1972). The trial court reviewed the photo arrays and heard testimony about the photo array procedures; it found that they were not unduly suggestive. These findings were enough, by themselves, to admit the testimony concerning the photo identification; no reliability finding was necessary. *Greenwood, supra*, 659 A.2d at 828. Although the trial judge went on to make a preliminary reliability finding, and instructed the government to remind him to make a final reliability determination at trial, it cannot be error to omit such final determination when none is required. *Id.*